[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
The Department of Children and Families ("DCF") originally CT Page 5316-JJJJ filed neglect and termination of parental rights petitions with respect to the above named child at the Superior Court for Juvenile Matters in Rockville. The neglect petitions, which alleged counts of neglect and abuse by each parent, were filed on May 5, 1995. DCF also sought and received an ex parte order granting it temporary custody of the child on that date. Coterminous petitions seeking the termination of the mother and father's parental rights were subsequently filed at the court in Rockville on November 6, 1995. All of the petitions were subsequently transferred to this venue for hearing.
Trial in this matter was scheduled for August 26-27, 1996. At the outset of trial, DCF withdrew its petition for termination of parental rights. Pursuant to an agreement of the parties, the respondent mother and father each entered no contest pleas to the neglect allegation set forth in each petition. In consideration of those pleas, which were accepted after canvass by the court, the parties agreed that the abuse allegation pending against each parent would be dismissed. Based on those pleas, the court entered adjudication with respect to each respondent that Laurie Ann is a neglected child. Because there was no agreement as to disposition, a contested dispositional hearing was held by the court on August 26-27.
At trial, the mother, Robin H., and the father, Keith H., were represented by separate counsel. The child's maternal grandparents, Sandra and Ivan C., had previously been granted intervenor status for disposition only in this matter, and were represented throughout the proceeding by their attorney. The minor child and the petitioner were also represented by their respective counsel.
The court heard testimony during the dispositional hearing from the following witnesses called by DCF:
(1) Kathy Dayner, DCF Social Worker;
(2) Patricia M., the child's foster parent;
(3) Dr. David Mantell, the court-appointed psychological evaluator.
Ivan C., the paternal grandfather, also testified at trial. Both respondents, and the maternal grandmother, did not testify.
DCF introduced the following exhibits into evidence: CT Page 5316-KKKK
(1) Social Study dated November 6, 1995 (Petitioner's Exhibit 1);
 (2) Addendum to Social Study dated August 23, 1996 (Petitioner's Exhibit 2);
 (3) Psychological Report by Dr Mantell dated June 24, 1995 (Petitioner's Exhibit 3);
 (4) Psychological Report by Dr. Mantell dated February 16, 1996 (Petitioner's Exhibit 4);
 (5) Psychological Report by Dr. Mantell dated July 3, 1996 (Petitioner's Exhibit 5).
No other evidence was offered by any of the other parties. Each party made closing arguments at the conclusion of the trial.
FINDINGS OF FACT
The court, having carefully considered the evidence and testimony adduced at trial, makes the following factual findings with respect to disposition:
Laurie Ann W. is four years of age, her date of birth being July 28, 1992. She was removed from the parental home by DCF on May 3, 1995, after she was observed with extensive bruises on her body by Patricia M., her current foster parent. These injuries were the result of one or both parents striking the child and, as noted above, each parent has plead nolo contendere to the allegation that Laurie Ann was "being permitted to live under conditions, circumstances or associations injurious to her well being." Evidence in the psychological studies indicates that the child was hit primarily by the father, and less frequently by the mother. At that time of the child's removal, Patricia M., who had been a co-worker of both the mother and maternal grandmother, was Laurie Ann's day care provider. Patricia M. was subsequently asked by both the mother and DCF to serve as the child's foster parent, and Laurie Ann has lived in her home for approximately the past 16 months. Patricia M., and her husband Brian M., have provided a supportive and nurturing foster home environment for the child. The foster mother testified at hearing, and is obviously respected by all of the individual parties in this case, as well as by DCF. CT Page 5316-LLLL
During the past 16 months, each of the parents has been involved in individual therapy. However, Dr. Mantell, the court-appointed evaluator, testified that he believes both the parents still have unresolved psychological issues which must be addressed before reunification with the child can take place. Specifically, Dr. Mantell believes that both parents lack insight as to what prompted them to strike Laurie Ann. He finds this disturbing, particularly given the extensive nature of the abuse in this case. The court accepts Dr. Mantell's opinion in this regard as being both credible and factually supported. It also agrees with the evaluator that the parents must demonstrate an understanding of what caused them to mistreat the child, in order to exercise greater self-control in the future, and offer assurances that the child can be safely returned to their home.
Dr. Mantell recommended in June of 1995 that both parents "should be allowed supervised and therapeutically guided interaction with their daughter." (Petitioner's Exhibit 3, page 14). Although the mother has had unsupervised visits with Laurie Ann for a number of months now, the father has only recently begun face to face visits with Laurie Ann. These therapeutic visits are supervised by a clinical psychologist, Dr. Norman Breyer. The child has demonstrated "anticipatory anxiety" before these visits take place. She acts out and articulates fear of seeing her father prior to the visits, but then seems to adjust appropriately during the visitation session itself. Per Dr. Mantell, Laurie Ann's reactions suggest that Laurie is fearful of visiting her father because she "is reliving past abuse" and/or that Laurie is experiencing difficulties in making the transition from her foster parents to her natural parents. Dr. Mantell has opined that Laurie Ann should be "cautiously" reunited with the respondents. He testified that further therapeutic visits between the father and child are necessary to gauge how the child will react when she has unsupervised visits, or ultimately returns to live with both her parents.
Dr. Mantell wrote in his July 3, 1996 evaluation: "In my view it is premature to consider returning the child to parental care. I cannot recommend unsupervised contact between the child and the father. It may be time to consider therapeutically supervised father and daughter visitation. It may also be time to consider allowing the child extended home visitation with the maternal grandparents and with the mother. I think it is premature, however, to allow the father to participate in home visitation. I CT Page 5316-MMMM also consider it premature to take the child out of her protective and important foster home placement, where I know she has strong psychological roots. A reunification plan will need to take into account . . . the child's attachments to the foster family and the challenges that this will present to the child at points of transition and when she begins to spend more time outside of the foster home." (Petitioner's Exhibit 5, page 5).
Counsel for the respondent, Keith H. argued at trial that although Dr. Mantell initially recommended therapeutic visits between Laurie Ann and her father more than a year ago, these visits have only recently commenced. The court notes that DCF only recently decided to withdraw its November, 1995 termination of parental rights petition and support a plan for reunification. Although the court offers no opinion on the efficacy of DCF's original decision to pursue a co-terminous TPR, it does note that the delay in facilitating the supervised, therapeutic father-daughter visits has certainly retarded the reunification plan which DCF now espouses. If DCF had attempted the "therapeutically guided interaction" which the evaluator recommended in 1995, it might have reached an earlier decision with respect to the termination petition, and all concerned with this case would today have a clearer understanding about Laurie Ann's needs and best interests. The court is also concerned that the strong psychological attachment which the child understandably feels for her foster parents grows stronger with each passing day, thereby making the proposed transition even more problematic.
The various parties to this action have offered diverse proposals about an appropriate disposition in this matter. DCF advocates that Laurie Ann be committed to DCF for a period of up to 12 months, with placement in her current foster home. It proposes to make a referral to a program operated by the Casey Foundation. If that program "accepts" a referral of this case, it would oversee a plan which would attempt to reunite the parents with Laurie Ann over a time period of approximately six months. Casey would monitor contacts between the child, her parents, and her grandparents, and act as a liaison with other service providers and therapists involved with the case. DCF also proposes that visitation between the mother and maternal grandparents mirror the pendente lite visitation currently in place, and that the father visit with Laurie Ann under the direction of Dr. Breyer. The petitioner also expressed a willingness to consider expanding the access which each respondent has with the child in accordance with the future CT Page 5316-NNNN recommendations of Casey and Dr. Breyer. Counsel for the minor child was in essential accord with the petitioner's plan.
The mother requested through counsel that Laurie Ann be returned to her immediate custody, under an order of protective supervision by DCF. She indicated that if the court is willing to issue such an order, her husband would vacate the premises until DCF and other experts deemed it appropriate for him to return. The mother expressed a willingness to abide by court-approved expectations during this period of protective supervision. The mother did not support an alternative proposal made by her parents that Laurie Ann's guardianship or custody be given to them until the respondents were able to care for the child.
The respondent father advocated a return to the mother under protective supervision. He indicated that he would, if required, vacate the family home so that Laurie Ann could be reunited with his wife.
The maternal grandparents proposed three alternative plans for the child:
(1) That Laurie Ann's guardianship be transferred to them; or
 (2) That Laurie Ann be committed to DCF and that they be given physical custody of the child as state licensed foster parents; or
 (3) That in the event the court does not grant them custody or guardianship, that they receive expanded visitation with the child in accordance with a schedule they proposed at trial.
Having reviewed the various proposals, as well as all the evidence and testimony, the court concludes that it would not be in Laurie Ann's best interests to restore her to the care and custody of either parent at this time. It is evident that neither parent, nor the child, is psychologically ready to make that transition today. Each respondent needs additional individual psychotherapy to work on issues related to insight, self-control, and appropriate parenting. Furthermore, it is clear that further therapeutically-supervised visits between the father and daughter will be necessary to allay the child's fears and rebuild a bridge of trust. CT Page 5316-OOOO
The court does not doubt that the maternal grandparents are caring and concerned individuals who deeply love Laurie Ann and are capable of caring for her. The court respects their well-motivated desire to help their granddaughter and reunify the entire family. However, the court does not believe that it would be in the child's best interests at this time to transfer her custody or guardianship to the maternal grandparents. Since the present goal is reunification in the parental home, it would be disruptive and confusing to uproot this four-year-old child from her present foster home of 16 months for the purpose of placement with new temporary caretakers. As Dr. Mantell noted at hearing, the child has done "wonderfully" in her present foster care. He added that the foster home is a "known quantity" and that a "new scenario would confuse the picture" and make it more difficult to "read the child's feelings."
ORDERS
Accordingly, having previously adjudicated Laurie Ann W. as a neglected child, the court hereby orders that her care and custody be vested with the Commissioner of the Department of Children and Families, for a period not to exceed 12 months. Given the specific facts and history of this case, and pursuant to C.G.S. § 46b-121 (b), the court also makes the following orders:
 1. Absent compelling exigent circumstances, DCF is not to remove the child from her present foster home for other foster care placement without further hearing and approval by the court.
 2. DCF has indicated that it will refer this family for possible reunification services offered by the Casey Foundation. DCF is ordered to make this referral forthwith, and to report to the court in writing whether or not Casey accepts this referral. In the event that Casey accepts the case, DCF is ordered to file a written report to the court within 30 days thereafter outlining the reunification services which Casey will provide the family, and the estimated timetable for reunification.
 3. In the event that Casey does not accept involvement in this case, DCF is ordered to formulate its own plan for parental reunification and file a report thereon with the court within 30 days after notification of Casey's refusal. Said report shall include an outline of the reunification services which DCF will CT Page 5316-PPPP secure for the family and the estimated timetable for reunification.
 4. DCF is ordered to conduct, or obtain through another appropriate agency such as Casey, an assessment of the maternal grandparent's capabilities and fitness to function as guardians or custodians of Laurie Ann, in the event that parental reunification can not be achieved. The report of this assessment is to be filed with the court on the date of the In Court Review which this court will conduct to monitor the progress of this case (see below).
 5. At present, the father shall visit with Laurie Ann under the supervision of Dr. Norman Breyer, per a schedule established by Dr. Breyer in consultation with DCF. At the recommendation of Dr. Breyer, DCF may expand father's visitation in any manner which is consistent with the child's safety and well-being. Father shall also be allowed reasonable telephonic contact with the child.
 6. The mother shall visit with Laurie Ann according to the pendente lite schedule previously ordered by the court. DCF may expand mother's visitation in any manner which is consistent with the child's safety and well-being. Mother shall also be allowed reasonable telephonic contact with the child.
 7. The maternal grandparents shall visit with Laurie Ann every Saturday from 9:00 a.m. until 6 p.m. The mother may also visit with the child during these visits at the grandparent's home. DCF may expand the grandparent's visitation to include occasional overnight visitation if DCF deems it appropriate to do-so. DCF, in its discretion, may approve out-of-state day trips by the grandparents and Laurie Ann. The maternal grandparents shall also be allowed reasonable telephonic contact with the child. In addition, DCF is ordered to arrange a schedule of day visits between Laurie, her maternal grandparents, and (at present) the child's mother which will be held at the grandparents home on major holidays (e.g. Thanksgiving, Christmas, New Year's Day, etc.) during the next six months. The court is mindful that parental] reunification is the goal in this case, and cautions the grandparents that changes in their visitation schedule will probably become necessary as each parent's access to the child is increased.
7. All parties shall cooperate in affectuating visitation by CT Page 5316-QQQQ the parents and maternal grandparents and shall consult with one another and make reasonable efforts to resolve any disagreements or problems which might arise about visitation in the future.
 8. In order to monitor compliance with these orders, including those related to visitation, this court shall maintain ongoing jurisdiction over this case.
 9. This court will conduct an In Court Review of this case on January 9, 1997, at 10:00 a.m. All parties and counsel shall attend this hearing. DCF shall file with the court at that hearing a written status report, which shall include an assessment of the progress being made towards reunification, additional recommendations, if any, and the evaluation of the grandparents referred to above.
 10. No party shall assault or physically discipline the child or do any act detrimental to the child's physical or emotional well-being.
 11. The parties and counsel shall meet with the Court Service Officer of this court on September 20, 1996 at 11:30 a.m. for the purpose of drafting, agreeing upon and signing written, court-approved expectations consistent with those indicated below.
 COURT-APPROVED EXPECTATIONS
It is expected that the mother will continue in counseling with her individual therapist, cooperate with the Casey Foundation evaluation, cooperate with any parenting programs or other services or treatment recommended by DCF or Casey, keep all appointments set by or with DCF, visit the child as often as DCF permits, comply with all visitation conditions established by DCF, keep her attorney and DCF advised of her place of residence and telephone number, maintain adequate housing and income, avoid violations of the law, sign any and all releases requested by Casey or DCF, and perform all acts reasonably necessary to accomplish the goal of reunification.
It is expected that the father will continue in counseling with his individual therapist, cooperate with the Casey Foundation evaluation, cooperate with any parenting programs or other services or treatment recommended by DCF or Casey, keep all appointments set by or with DCF, visit the child under therapeutic supervision (or in accordance with other terms and CT Page 5316-RRRR conditions established by DCF) as often as DCF permits, comply with all visitation conditions established by DCF, keep his attorney and DCF advised of his place of residence and telephone number, maintain adequate housing and income, avoid violations of the law, sign any and all releases requested by Casey or DCF, and perform all acts reasonably necessary to accomplish the goal of reunification.
It is expected that the maternal grandparents will cooperate fully with the Casey Foundation evaluation and with the specific evaluation of their potential fitness for possible custody or guardianship, visit with the child as often as DCF permits, comply with all visitation conditions established by DCF (including those conditions relating to the child's visits with her parents and others) permit DCF, or its designee, upon reasonable notice, to visit with the child when the child is at the grandparents' home, and sign any and all releases requested by Casey or DCF.
The court commends all counsel for the highly professional and dignified manner in which they advocated their repective clients' interests during the course of the trial.
Dated at Middletown, Connecticut this 3rd day of September, 1996.
Dyer, J.